IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRINTON BUSINESS VENTURES, INC.,
dba Evergreen Vending, dba Vending
Equipment Center, dba Northwest Coffee
Services, dba Avanti Markets Northwest,

                Plaintiff,

    v.

RICHARD SEARLE,

                Defendant.

No. 3:16-cv-02279-HZ

OPINION & ORDER

Bruce L. Campbell
Nicholas H. Pyle
MILLER NASH GRAHAM & DUNN LLP
111 SW Fifth Avenue, Suite 3400
Portland, OR 97204

      Attorneys for Plaintiff

Alex C. Trauman
Jeremy G. Tolchin
MOTSCHENBACHER & BLATTNER LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Brinton Business Ventures, doing business as Evergreen Vending, Vending Equipment Center, Northwest Coffee Services, and Avanti Markets Northwest (hereinafter, "Brinton"), seeks to enjoin its former branch manager, Richard Searle, from competing against Brinton or soliciting Brinton's customers in violation of the terms of his non-competition agreement with Brinton. The parties conducted limited discovery in order to fully brief this motion. The Court held oral argument on March 15, 2017. Brinton's motion for a preliminary injunction is granted, subject to this Court's modifications as detailed below.

## BACKGROUND

      Brinton contracts with employers to install, service, maintain, and operate "micro markets" at workplaces around Oregon and Washington. Compl. ¶ 7, ECF 1. Micro markets are "unattended retail stores located directly on the premises of large employers, offering employees the opportunity to purchase food, beverages, and other items without leaving their workplace." *Id.* Brinton's Portland, Oregon branch covers a territory stretching from Longview, Washington, south to Eugene, Oregon. *Id.* at ¶ 8.

      Mr. Searle accepted an offer to be Brinton's Portland, Oregon branch manager on January 8, 2012. *Id.* at ¶ 9. Upon accepting Brinton's employment offer, Mr. Searle said he would resign from his then-current employer on January 27, 2012, and would begin working for Brinton on January 30, 2012. *Id.*

On January 13, 2012, Mr. Searle visited Brinton's Portland branch office. *Id.* at ¶ 10. As discussed in greater detail below, the parties disagree about whether Mr. Searle received a copy of a non-competition agreement on that day.

At some point between January 13, 2012 and January 23, 2012, Mr. Searle contacted Brinton and asked if he could start working for Brinton sooner than planned. *Id.* at ¶ 11. Brinton agreed to Mr. Searle's request and permitted him to begin working on January 23, 2012. *Id.*

On January 23, 2012, Mr. Searle arrived at Brinton's office and signed a Non-Competition Agreement (hereinafter, "Agreement") that contained non-competition and non-solicitation provisions. Compl. Ex. A ("Agreement"), ECF 1-1. The non-competition provision prohibits Mr. Searle from competing with Brinton in a specified geographic area for two years after his employment ends with Brinton. *Id.* The non-solicitation provision prohibits Mr. Searle from soliciting, for two years after his employment ends with Brinton, any people who were Brinton's customers or prospective customers when Mr. Searle worked at Brinton. *Id.*

On March 17, 2016, Mr. Searle sent an email to Jim Brinton, president of the company, and Bruce Brinton, vice-president of the company, stating that he wished to resign. Compl. ¶ 18. While still employed by Brinton, on March 22, 2016, Mr. Searle filed a registration with the Oregon Secretary of State to establish a new business named R Squared Markets & Vending Corporation. *Id.* at ¶ 19. The incorporators listed in the filing with the Secretary of State were Mr. Searle and Richard Corwin, a general manager at Brinton's Portland branch who worked under Mr. Searle's supervision. *Id.* On April 1, 2016, Mr. Searle's employment with Brinton ended. *Id.* at ¶ 21. Mr. Corwin continued to work for Brinton until June 15, 2016. *Id.* at ¶ 22.

In late September of 2016, Brinton's largest customer in Oregon, Lam Research, cancelled its contract with Brinton. *Id.* at ¶ 24. Brinton believes that Mr. Searle "solicited the

business of Lam Research and induced Lam Research to abandon its relationship with Brinton and to sign a contract with Mr. Searle's new business." *Id.* at ¶ 25. Mr. Searle and his business are now operating one or more micro markets on Lam Research's Tualatin campus. *Id.* Brinton also believes that Mr. Searle has induced other customers, such as Nippon Dynowave, to terminate their relationship with Brinton and enter into business with Mr. Searle. *Id.* at ¶ 26. Lam Research and Nippon Dynowave were Brinton customers that Mr. Searle was responsible for during his time as Brinton branch manager. *Id.* at ¶¶ 24, 26.

## STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff "must establish that irreparable harm is *likely*, not just possible[.]" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*

Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four required elements set forth above. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion") (quoting *Mazurek*, 520 U.S. at 972) (emphasis in original).

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Therefore, in deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, declarations from interested parties, and arguments raised for the first time in a reply. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008).

## DISCUSSION

The Court grants the motion for a preliminary injunction because Brinton establishes a likelihood of success on the merits and a likelihood of irreparable harm. The balance of the equities also tips somewhat in Brinton's favor. The public interest factor is neutral.

**I.      Likelihood of Success on the Merits**

To succeed on its motion for a preliminary injunction, Brinton must demonstrate a likelihood of success on the merits of its claims. Brinton alleges that Mr. Searle breached the parties' non-competition and non-solicitation agreements.

A.  Non-Competition Agreement

To be enforceable under Oregon law, a covenant not to compete must meet both the requirements of Oregon Revised Statute § (O.R.S.) 653.295 and Oregon's common law governing restraints on trade. *Nike, Inc. v. McCarthy*, 379 F.3d 576, 580-87 (9th Cir. 2004). Mr. Searle contends that the Agreement in this case is unenforceable because he voided the Agreement, as allowable under O.R.S. 653.295, and the Agreement is not reasonably limited.

1.   The non-competition provision of the Agreement is voidable.

The parties sharply dispute whether the non-competition provision of the Agreement is voidable under Oregon law. It is undisputed that Brinton did not provide Mr. Searle with a copy of the Agreement two weeks before the first day of Mr. Searle's employment, as required by O.R.S. 653.295(1)(a)(A). However, Brinton contends that it provided the Agreement to Mr. Searle more than two weeks before the original agreed-upon employment start date. Thus, Brinton argues that it should not be punished for accommodating Mr. Searle's request to start working for Brinton sooner than the parties had initially planned.

In pertinent part, O.R.S. 653.295 provides:

(1) A noncompetition agreement entered into between an employer and employee is voidable and may not be enforced by a court of this state unless:

a.   (A) The employer informs the employee in a written employment offer received by the employee at least two weeks before the first day of the employee's employment that a noncompetition agreement is required as a condition of employment[.]

O.R.S. 653.295(1)(a)(A).

The parties agree that, on the first day of his employment, January 23, 2012, Mr. Searle signed the Agreement. *Id.* at Ex. C, ECF 7-3. The disagreement centers on when Mr. Searle received the Agreement from Brinton and whether he received notice in a written employment offer that a non-competition agreement was required as a condition of employment.

Jim Brinton, President of Brinton, testified in his deposition that, during Mr. Searle's job interview, Mr. Brinton told him that he would be asked to sign a non-competition agreement. Trauman Decl. Ex. B ("Brinton Depo.") 26:14-17, ECF 19. Mr. Brinton also declares that Mr. Searle visited Brinton's office on January 13, 2012, and received a packet of information regarding his job, including the Agreement. Brinton Decl. ¶ 6, ECF 7. At that point, Mr. Searle

was slated to start work with Brinton in over two weeks, on January 30, 2012. *Id.* Only after that

meeting did Mr. Searle arrange to move up his start date to January 23, 2012. *Id.*

Mr. Searle, however, submits a declaration that directly contradicts Mr. Brinton's

assertions. Searle Decl., ECF 20. According to Mr. Searle, he was first presented with a proposed

non-competition agreement on his first day of employment with Brinton, January 23, 2012. *Id.* at

¶ 9. Mr. Searle declares that he did not discuss a non-competition agreement with Mr. Brinton

during their January 13, 2012 meeting. *Id.* at ¶ 8. In fact, Mr. Searle contends that he did not

receive any documents at all from Brinton during the January 13, 2012 meeting. *Id.*

The parties also submit conflicting declarations from Shelley Soomann, the highest-

ranking employee in Brinton's Human Resources Department. First Soomann Decl., ECF 22;

Second Soomann Decl., ECF 25. Ms. Soomann worked for Brinton from approximately June

2010 to June 2012. First Soomann Decl. ¶ 2. In Ms. Soomann's first declaration, she states that

Brinton did not have a practice of sending or presenting employees with non-competition

agreements in advance of their first day of employment. *Id.* at ¶ 4. Instead, she says that the

"one-size-fits-all" approach Brinton used to document new hires consisted of the new hire being

presented with a new-hire packet, which included the Agreement, on the first day of

employment. *Id.* at ¶ 5. She declares that "[c]onsistent with this practice, [she] prepared a new-

hire packet for Mr. Searle to sign on his first day of employment at Brinton, which was on

January 23, 2012." *Id.* Because she was the highest-level human resources employee at Brinton,

Ms. Soomann attests that she would have been expected to be informed if the company intended

to deviate from its usual hiring practices by presenting Mr. Searle with a new-hire packet in

advance of his first day of employment. *Id.* at ¶ 7.

However, in Ms. Soomann's second declaration, she states that she was not involved in the hiring of Mr. Searle and that she does not know whether Mr. Searle was given a new-hire packet prior to his first day of employment. Second Soomann Decl. ¶ 6. She also declares that "it is possible Mr. Searle was given a new-hire packet before his first day of employment." *Id.*

Clearly, there are disputes of material facts that go directly to the issue of whether or not the Agreement was voidable under O.R.S. 653.295 for failure to notify Mr. Searle of the required non-competition provision "in a written employment offer received by the employee at least two weeks before the first day of the employee's employment." These disputes preclude the Court from concluding that Brinton's version of the facts is more likely true than not true. *See Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir. 1986) (internal citations omitted) ("In deciding a motion for preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'"); *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016) (reiterating that "on motion for preliminary injunction, the plaintiff—as the moving party—bears the burden of establishing the merits of its claims"). Because Brinton fails to establish that the Agreement was not voidable, the Court proceeds under the assumption that the non-competition provision of the Agreement was voidable.

2.  Mr. Searle did not void the non-competition provision of the Agreement.

The Court's next task is to determine whether Mr. Searle, in fact, voided the non-competition provision of the Agreement, as he alleges.

A recent case from the Oregon Court of Appeals is instructive. *See Bernard v. S.B., Inc.*, 270 Or. App. 710, 350 P.3d 460, *review denied,* 358 Or. 69, 363 P.3d 500 (2015). In *Bernard*, the plaintiff's legal theories relied on her contention that her noncompetition agreement with the

defendant was unenforceable under O.R.S. 653.295 because the defendant failed to notify her two weeks before she started work that a noncompetition agreement would be required. *Id.* at 712, 350 P.3d at 461. The court found that the evidence established that the noncompetition agreement was voidable. *Id.* However, the court explained that "this does not end the analysis." *Id.* at 716, 350 P. 3d at 463. The plaintiff had to show not only that the agreement was voidable, but that she had actually taken steps to void the agreement. *Id.*

The *Bernard* court noted that O.R.S. 653.295 was amended in 2007 to change "the presumptive status of noncompetition agreements that do not comport with all of the statutory requirements." *Id.* at 719, 350 P.3d at 464. Whereas prior to 2007, such a contract was "void," after 2007, the contract is "voidable." *Id.* "Put differently, the change to 'voidable' means that an employee who wants be relieved of what the employee believes to be an unenforceable noncompetition obligation must take affirmative steps to 'avoid' that obligation; otherwise, it remains valid." *Id.*

Mr. Searle contends that he voided the Agreement. Mr. Searle submits a letter that was sent by Mr. Searle's attorney to Brinton on September 27, 2016. Trauman Decl. Ex. C. Mr. Searle contends that the letter manifested his election to void any voidable legal obligations created by the Agreement:

> We are unaware of any non-competition obligations that are binding on Mr. Searle as a former Oregon employee of Brinton. . . . [I]f your client continues to send the threatening letters to my client, we will initiate a lawsuit in Multnomah Circuit Court where my client will seek declaratory relief to confirm that he has not violated any alleged covenants owed to your client.

*Id.*

Mr. Searle's argument suffers from a fatal defect. Mr. Searle stopped working for Brinton in April of 2016 and did not send this letter until Brinton contacted Mr. Searle to threaten "a

variety of unspecified legal claims . . . including the enforcement of an alleged non-competition agreement." *Id.* At oral argument, Mr. Searle insisted that there was no problem with the timing of his letter expressing his election to void the Agreement. The Court disagrees.

Mr. Searle correctly points out that O.R.S. 653.295 does not provide a deadline by which an employee must express his intent to void a non-competition agreement. In addition, *Bernard* does not expressly state what point is too late for an employee to void an agreement. However, this Court can easily draw inferences from *Bernard* to reach an answer in this case.

In *Bernard*, plaintiff's failure to take steps to void her agreement caused the court to rule against her at summary judgment. Thus, *Bernard* instructs that a plaintiff cannot wait until summary judgment proceedings to invoke her intent to void the agreement. Furthermore, the *Bernard* court wrote: "The most that plaintiff can show is that the agreement may have been voidable; however, because *it had not been voided at the time that defendant sought to invoke the contract*, the agreement was valid and in effect." *Id.* at 719, 350 P.3d at 465 (emphasis added). This strongly suggests that the Oregon Court of Appeals interpreted O.R.S. 653.295 to require a plaintiff to void a non-competition agreement prior to the defendant's effort to enforce the agreement.

As the *Bernard* court explained, "[i]t would frustrate the intent of the legislature to hold that a noncompetition agreement executed without notice is absolutely unenforceable *regardless* of the subsequent conduct of the contracting parties (including, for example, an employee's express ratification of the agreement notwithstanding its voidability)." *Id.* Here, because Mr. Searle expressed his intent to void the non-competition agreement only after Brinton sought to enforce it and once Mr. Searle had already been competing against Brinton for five months, Mr. Searle did not validly void the agreement. *See* Restatement (Second) of Contracts § 7 (1981)

(prompt action is necessary to void a contract and to "prevent the contract from producing the ordinary legal consequences of a contract"). Thus, Mr. Searle is bound by the Agreement, as long as it satisfies the common law requirements of reasonableness. *See Bernard*, 270 Or. App. at 718, 350 P3.d at 464 ("The propriety of calling a transaction a voidable contract rests primarily on the traditional view that the transaction is valid and has its usual legal consequences until the power of avoidance is exercised.").

                3.    The non-competition provision of the Agreement is reasonable.

As to the reasonableness of the non-competition restrictions, under Oregon law, a non-compete agreement must meet three requirements in order to be enforceable: "(1) it must be partial or restricted in its operation in respect either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public." *Nike*, 379 F.3d at 584–85 (citing *Eldridge v. Johnston*, 195 Or. 379, 245 P.2d 239, 250 (1952)). "To satisfy the reasonableness requirement, the employer must show as a predicate that it has a legitimate interest entitled to protection." *Id.* (quotations and citations omitted).

Mr. Searle argues that the non-competition provision is overbroad. The non-competition provision restricts Mr. Searle from competing with Brinton for two years after his termination by Brinton, "within a distance 30 miles in all directions from any of the Companies [sic] current customers." Agreement ¶ 1. Specifically, the Agreement provides that:

> [Mr. Searle] will not own, manage, operate, control or be employed by, participate or be connected in any manner, or in any way be associated in any other relation or capacity whatsoever with the ownership, management, operation or control of any business engaged in rendering services related to the vending, marketing and/or distribution of food, snack or related items to consumers at or near their place of employment[.]

*Id.*

Mr. Searle points to *Konecranes, Inc. v. Scott Sinclair*, 340 F. Supp. 2d 1126 (D. Or. 2004), which offers guidance on how to determine the reasonable scope of a non-compete agreement. In *Konecranes*, Mr. Sinclair managed Konecranes' Portland branch. *Konecranes*, 340 F. Supp. 2d at 1128. The parties entered into a non-compete agreement which prevented Mr. Sinclair from competing for a period of 18 months in "[a]ny area in which KCI Konecranes, Inc. is engaged in business." *Id.* at 1130. Konecranes conducted business within a 150 mile radius of Portland. *Id.* Therefore, Judge Panner reasoned that the non-compete agreement "would effectively bar Sinclair from working in the same industry in the principal industrial areas of Oregon and Washington" as well as within the area of the 65 Konecranes locations in the United States alone. *Id.* at 1130-31. "The non-compete agreement [was] not limited to Plaintiff's Portland branch, or to specific tasks, or to soliciting customers that Sinclair serviced while employed by Plaintiff." *Id.* Judge Panner explained:

> In deciding whether a non-compete agreement is reasonable, an important consideration is whether it merely restricts the former employee from luring away specific accounts (*i.e.,* those he serviced while employed) or whether it restricts the employee from competing at all. In the former instance, the employee might gain an unfair advantage, such as goodwill and inside information, derived from his prior contacts with the client. It is much harder to justify barring a former employee from competing altogether. The latter also is contrary to the public interest, and makes it difficult for the employee to pursue his livelihood. Thus, a restriction that says a stock broker can't solicit his former clients for one year might be upheld, but a restriction that says he can't work in the industry altogether might be unreasonable.

*Id.* Judge Panner concluded that the agreement was "probably not enforceable." *Id.* at 1131.

Several years later, Judge Ashmankas similarly found that a non-compete agreement was not reasonable because it did "not merely restrict defendants from soliciting clients they had actual contacts with while employed by plaintiff" but, rather, precluded "defendants from engaging in conduct that even indirectly diverts former or prospective customers from plaintiff."

*Naegeli Reporting Corp. v. Petersen*, No. 3:11-1138-HA, 2011 WL 11785484, at \*4 (D. Or. Dec. 5, 2011); *see also Actuant Corp. v. Huffman*, No. CV-04-998-HU, 2005 WL 396610, at \*11 (D. Or. Feb. 18, 2005) (finding a non-compete agreement unreasonably broad where it prohibited the employees "from working in the field in a similar position without any regard to his ability to use (or misuse) the similar position to exploit protectable interests and knowledge gained while working for plaintiff, to plaintiff's disadvantage and to the advantage of the competitive business").

In contrast, a recent unpublished opinion, the Ninth Circuit upheld a non-compete agreement because the terms guarded against a "substantial risk" that the former employee would use proprietary information he acquired as an employee to "divert all or part of the employer's business." *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 648 F. App'x 709, 711 (9th Cir. 2016) (citing *Nike,* 379 F.3d at 586). The Court explained that "[i]t is well-established that a noncompete agreement is a reasonable means of protecting against such a risk." *Id.* The Court upheld an injunction encompassing the employer's "Clackamas Region" and a 100–mile radius from Mukilteo, Washington. *Id.*

Here, Mr. Brinton declares that Mr. Searle was responsible for cultivating and maintaining relationships with Brinton's customers throughout Oregon and southwest Washington, "from Longview to Eugene." Brinton Decl. ¶¶ 9, 11. As a branch manager, Mr. Searle had "access to, became familiar with, and acquired knowledge about Brinton's customers, target customers, employees, operations, pricing methods, delivery schedules, sources of supply, financial information, margin profiles, product rollouts, marketing projects, pricing strategies, product allocation, data capabilities, and other confidential information" that Brinton did not disclose to competitors. Brinton Decl. ¶ 9. Mr. Brinton testified that the effect of the non-

competition provision's restriction on place means that Mr. Searle would only be permitted to compete in eastern Washington, eastern Oregon, or southern Oregon south of Eugene. Brinton Depo. 62-64, ECF 19.

Mr. Searle argues that the non-competition provision is overbroad because it "does not merely restrict Searle from doing business with those customers with whom he interacted while employed at Brinton." Def.'s Opp. 12, ECF 18. However, as the Ninth Circuit explained, the risk that an employee could use proprietary information he acquired as an employee to divert all or part of the employer's business "goes beyond direct solicitation of customers and explicit disclosure of confidential information." *Ocean Beauty Seafoods,* 648 F. App'x at 711. Because Mr. Searle has not refuted Mr. Brinton's allegation that he could use information acquired while working for Brinton to divert part of Brinton's business, that aspect of the non-competition provision is reasonable.

However, the geographic scope of the non-competition provision is not reasonable. While Mr. Searle was responsible for developing relationships with customers from Longview to Eugene, the non-competition provision restricts him from competing within 30 miles of *any* of Brinton's current customers. Such a restriction is not reasonable. However, "an overly broad territorial limitation does not automatically make an agreement not to compete unenforceable." *Ocean Beauty Seafoods*, 648 F. App'x at 710-11. Instead, "Oregon law endorses reformation if necessary to make a noncompete agreement reasonable in scope." *Id.*

Therefore, the Court amends the non-competition provision's geographic scope. Instead of restricting Mr. Searle from competing within 30 miles of any of Brinton's current customers, Mr. Searle is prohibited from competing within 10 miles of any current customer. Restricting

Mr. Searle in this way will ensure that the non-competition provision serves its purpose without being overbroad.

    B.  Non-Solicitation Agreement

    In addition to the non-competition provision, the parties' Agreement contains a non-solicitation provision:

> Employee agrees that for a period of two (2) years after such employment ceases, regardless of the cause thereof, he/she shall not directly or indirectly aid in soliciting any business relating to that conducted by Company, as described above from any persons who were customers or prospective customers of Company prior to the cessation of his/her employment. Nor, shall they contact any of Company's existing employees in an effort to solicit them away from Company.

Agreement ¶ 4. Brinton seems likely to succeed on the merits of its Breach of the Non-Solicitation Agreement Claim (Claim 2) because Mr. Searle is currently doing business with at least two companies, Lam Research and Nippon Dynowave, which were customers of Brinton while Mr. Searle was a Brinton employee.

    Mr. Searle contends that he is not bound to honor the non-solicitation agreement. He argues that the non-solicitation agreement does not meet the notice requirements of O.R.S. 653.295. However, the statute was amended effective January 1, 2008 to exempt non-solicitation agreements from the requirements of O.R.S. 653.295. *See* O.R.S. 653.295(4)(b) (stating that the requirements of O.R.S. 653.295(1) and (2), including the 2-week notice requirement, do not apply to "a covenant not to solicit employees of the employer or solicit or transact business with customers of the employer.") Furthermore, Mr. Searle did not void the Agreement, as discussed above.

    Mr. Searle next argues that the non-solicitation agreement is overbroad because it forbids him from doing business with customers with whom he had no direct contact while at Brinton.

However, he cites no authority for the proposition that this, on its own, renders the non-solicitation agreement unenforceable.

Mr. Searle, however, has a stronger argument that the non-solicitation is overbroad to the extent it prohibits him from soliciting business from "prospective customers" of Brinton. *See, e.g.*, *Naegeli Reporting Corp. v. Petersen*, No. 3:11-1138-HA, 2011 WL 11785484, at *4 (D. Or. Dec. 5, 2011) (finding a restriction on conduct that even indirectly diverts former or prospective customers from plaintiff to be "troubling"). Brinton appears to recognize that this language may be problematic and responds that "a fair reading of the term 'prospective customers' would apply that term to entities that Brinton was pursuing while Mr. Searle was the branch manager." Pl.'s Reply 20, ECF 24. At oral argument, Brinton urged the Court to reform the non-solicitation provision if needed to narrow the non-solicitation agreement's breadth to clarify what is meant by "prospective customers."

The Court agrees that the non-solicitation agreement should be reformed. Instead of restricting Mr. Searle from soliciting business from people who were "customers or prospective customers" of Brinton, Mr. Searle is only restricted from soliciting business from people who were customers of Brinton prior to the cessation of Mr. Searle's employment.

## II.    Irreparable Harm

The Ninth Circuit recently reiterated that "[a]n enforceable noncompete agreement affords fair protection to a legitimate interest of the former employer," and, thus, a breach of the agreement causes harm. *Ocean Beauty Seafoods*, 648 F. App'x at 711. "Because the harm is intangible and difficult to quantify, it qualifies as irreparable." *Id.* (citing *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence

of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

While the harm cannot be speculative, *see id.*, here Brinton presents evidence that Mr. Searle is currently servicing at least two of Brinton's former customers. Brinton Decl. ¶¶ 19-21. In addition, Brinton presents evidence that Mr. Searle has solicited at least an additional 10 Brinton customers. Pyle Decl. ¶ 16, Ex. 15, ECF 28-15; Brinton Decl. ¶ 3, Ex. A, ECF 27. Thus, in the absence of a preliminary injunction, Brinton will likely suffer some irreparable harm in the form of loss of client relationships. *See, e.g.*, *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1228 (D. Or. 2016) (granting a temporary restraining order where the plaintiff would "likely suffer some irreparable harm in the form of loss of client relationships and accompanying financial damage" even though there was no evidence that it would "likely suffer harm to its goodwill or reputation in the absence of temporary injunctive relief").

## III.    Balance of the Equities

Brinton's likelihood of success on the merits and irreparable harm tips the balance of equities in its favor as to its demand that Mr. Searle comply with the Agreement. *See. e.g., Ocean Beauty Seafoods*, 648 F. App'x at 711. As in *Ocean Foods*, the proposed injunction, as amended by this Court, imposes a burden on Mr. Searle but does not bar him from working within the micro market and vending industry, as long as he works outside of the designated geographic area. *Id.* In addition, "the risk of lost income can be mitigated by requiring [Brinton] to post a bond 'to pay the costs and damages sustained by any party found to have been wrongfully enjoined.'" *Id.* (citing Fed. R. Civ. P. 65(c)).

Mr. Searle argues that if Brinton obtains the injunctive relief it seeks, he will "be forced to choose between giving up a career in the micromarket and vending industry, or asking his

wife to quit her position so they can move far away so Seattle can work." Def.'s Opp. 15. The Court disagrees. Instead, granting the injunction will temporarily delay Mr. Searle's ability to pursue his career in the same geographic areas in which he worked for Brinton. However, it will not permanently hinder his ability to pursue his chosen career.

## IV.    Public Interest

The public interest does not weigh heavily in this case. The Ninth Circuit has recognized that Oregon law reflects a balancing of competing policies: "The freedom to pursue one's chosen occupation is in tension with freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically advantageous because they protect costly investments." *Ocean Beauty Seafoods*, 648 F. App'x at 711-12. Because the Agreement comports with Oregon law, "an injunction enforcing it is not antithetical to any public interest." *See id.*

## V.    Bond

While Mr. Searle asks that a bond be set for two million dollars, he submits no evidence to support his purported loss of livelihood or the need for a two million dollar bond. Brinton submits Mr. Searle's deposition, in which he states that R Squared currently generates no profit and does not pay Mr. Searle a salary or any other income. Searle Depo. 125:8-25, ECF 29-1. Mr. Searle testified that, currently, his only source of income is his wife. *Id.*

A bond of two million dollars would be excessive. Instead, the Court grants a bond in the amount of $100,000. This amount will cover the potential loss that might occur in the course of litigating this case, if the granting of this injunction is erroneous. *See Pulse Techs., Inc. v. Dodrill,* No. CV-07-65-ST, 2007 WL 789434, at *12 (D. Or. Mar. 14, 2007) (calculating a bond

based on an amount "sufficient to compensate [the plaintiff] for his costs and damages should this injunction have been improvidently granted").

## CONCLUSION

Plaintiff's motion for preliminary injunction [6] is granted, with the following modifications. In paragraph 1 of the Agreement, the parties will replace "within a distance 30 miles" with "within a distance 10 miles." In paragraph 4 of the Agreement, the parties will replace "customers or prospective customers" with "customers who were customers of Brinton prior to the cessation of Mr. Searle's employment."

In addition, Plaintiff must post a bond of $100,000. Within 10 days of the date below, the parties are directed to jointly contact the Courtroom Deputy to set a scheduling conference.

IT IS SO ORDERED.

Dated this _____30_____ day of _____March_____, 2017.


_____
MARCO A. HERNÁNDEZ
United States District Judge